UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SANDRA QUINTANILLA, *individually and on behalf of all others similarly situated*,

Plaintiff,

-v-

WW INTERNATIONAL, INC., *a Virginia Corporation doing business as* Weight Watchers, and DOES 1 through 50, inclusive,

Defendant.

20 Civ. 6261 (PAE)

OPINION &
ORDER

---

PAUL A. ENGELMAYER, District Judge:

In March 2020, as the COVID-19 pandemic spread, businesses throughout the country shuttered in-person operations to protect public health and slow the spread of the virus, many at the direction of state or local governments. Defendant WW International, Inc. ("WW")—which operates the health and fitness business "Weight Watchers"—is one such company. On March 16, 2020, WW moved its in-person services, which it had offered to subscribing members at brick-and-mortar workshops, online. Plaintiff Sandra Quintanilla, a citizen of California, was (and continues to be) a subscriber to those in-person services, and now sues WW on behalf of a putative class of similarly situated subscribers. She contends that WW's cancellation of in-person services, and transition of its workshop services online, without issuing refunds or any reduction in membership fees, violates several California consumer-protection statutes, *see, e.g.*, Cal. Civ. Code §§ 1750 *et seq.*; Cal. Bus. & Prof. Code §§ 17200, 17500 *et seq.*, and constitutes breach of contract, unjust enrichment, and money had and received. She seeks damages and injunctive relief on behalf of all WW subscribers who, like her, lost access to WW's in-person workshop services during the pandemic.

Before the Court is WW's motion to dismiss Quintanilla's claims for lack of standing and for failure to state a claim.  For the reasons below, the Court grants that motion on the latter ground.  Although Quintanilla has standing to pursue her individual claims for damages, these claims fail the pleading standards of Federal Rule of Civil Procedure 12(b)(6).

## I.    Background

### A.    Factual Background[1]

WW operates a nationwide weight-loss support program through which it, at the time the TAC was filed, offered three types of subscription-based memberships: (1) the Digital Membership, which provided access only to WW's website and app; (2) the Workshop + Digital Membership, which provided the same electronic access as the Digital Membership plus weekly in-person group workshops led by a WW coach; and (3) the Personal Coaching + Digital Membership, which provided the same benefits as the Workshop + Digital Membership plus one-on-one personal coaching.  TAC ¶ 10.

---

[1] This factual account draws from the third amended complaint, Dkt. 35 ("TAC").  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  The Court also considers documents that the TAC incorporates by reference.  *Id.*  That includes WW's terms and conditions, TAC ¶¶ 19, 81–89, and website, *id.* ¶¶ 10–11; *see Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 694 (S.D.N.Y. 2009) (Chin, J.) ("Because the Website is incorporated by reference into the Complaint, the Court may consider it on a motion to dismiss.") (collecting cases).  In resolving the motion to dismiss under Rule 12(b)(6), the Court presumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiff.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

WW has also moved to dismiss pursuant to Rule 12(b)(1), arguing that Quintanilla lacks standing to sue.  In considering that aspect of WW's motion, the Court has also considered the materials submitted by the parties in connection with WW's motion.  *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings.").

Since November 2018, Quintanilla has subscribed to the Workshop + Digital Membership, at a cost of $44.95 per month.  *Id.* ¶ 12.  She alleges that she signed up for this program, "in part, because she wanted to participate in the weekly in-person support meetings." *Id.*  She further alleges that "[o]n its website, [WW] touts that it holds more than 40,000 in-person Workshop meetings each week."  *Id.* ¶ 11.  However, the webpage she cites does not promise in-person services.  *Compare id.*, *with About Us*, WW, https://www.weightwatchers.com /about/crp/index.aspx ("Weight Watchers holds more than 40,000 meetings each week where members receive group support and learn about healthy eating patterns, behavior modification and physical activity.").  Nor do the terms and conditions ("T&C") of that membership promise that workshop meetings would take place in-person.  *See* Dkt. 40-1 ("T&C").  Rather, WW's T&C state that "[i]n [WW]'s sole discretion and without prior notice or liability, we may discontinue or modify any aspect of the Offerings."  *Id.* ¶ 3 ("Your Membership"); *see id.* ¶ 1 (defining "Offerings" to include "Monthly Pass," which means the "use of Workshop + Digital" Membership).

On March 16, 2021, as COVID-19 spread, WW closed its workshop locations and stopped offering in-person services.  TAC ¶ 13.  WW continued to charge all its Workshop + Digital members the same $44.95 monthly fee it had before the closure.  *Id.* ¶ 14.  On March 18, 2021, WW debited Quintanilla that amount; it has continued to do so since then.[2]  *Id.* ¶¶ 15–17.

---

[2] With this exception:  For two months beginning in May 2020, after Quintanilla contacted WW to cancel her membership, WW offered—and Quintanilla accepted—a free trial of WW's virtual offerings.  *See* TAC ¶ 16 ("Instead of refunding Plaintiff and cancelling her membership, Defendants encouraged Plaintiff to try the electronic (virtual) program and, in turn, offered to provide the next two months for free.  As such, defendants did not debit Plaintiff for the next two payment cycles.").  Elsewhere in the TAC, Quintanilla terms this exchange as WW's "refus[al]" to issue a refund, *see id.* ¶ 93, but the TAC's more specific allegations about this negotiation refute that characterization.

Quintanilla alleges that this transition from in-person to remote meetings "unilaterally downgrad[ed]" hers and all other Workshop + Digital members' subscriptions to what amounts to a Digital Membership, but that WW wrongfully failed to either issue a corresponding refund or to lower the price of her membership. *Id.* ¶ 18. She thus alleges that the transition rendered false and misleading WW's prior statements about the in-person aspects of the Workshop + Digital Membership. *Id.* ¶¶ 20–21, 39, 55, 63. She brings claims under the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 ("CLRA"), Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200–17208 ("UCL"), False Advertising Law, Cal. Bus. & Prof. Code § 17500 ("FAL"), and Weight Loss Contracts Act, Cal. Civ. Code § 1694.5 *et seq.* ("WLCA"), as well as claims for breach of contract, unjust enrichment, and money had and received.

WW disputes whether Quintanilla has suffered an injury in fact, given that Workshop + Digital members remain able to access virtual workshops. It argues, in any event, that all her allegations fail to state a claim. Dkt. 38 ("WW Mem."); Dkt. 40 ("Martin Decl.") ¶ 11.

### B.    Procedural History

On June 10, 2020, Quintanilla filed a complaint against WW in California Superior Court. Dkt. 1 ("Notice of Removal") ¶ 1. On June 25, 2020, she filed an amended complaint. *Id.*; *see* Dkt. 1-4 ("FAC"). On July 30, 2020, WW removed the case to federal court in the Central District of California. *See* Notice of Removal. On August 6, 2020, the parties stipulated to the transfer of this case from California to this District, citing a forum-selection clause in the T&C that both parties agreed governs Quintanilla's membership. Dkt. 10 at 2–3. The parties also jointly sought leave for Quintanilla to file a second amended complaint ("SAC"). *Id.* at 3. On August 7, 2021, Judge Phillips of the Central District of California ordered the case transferred and granted Quintanilla leave to file a SAC. Dkt. 11. On August 10, 2020, the case was transferred accordingly. Dkt. 12.

Upon transfer, the case was referred to this Court as possibly related to an earlier-filed action also against WW.  *See Vodden v. WW Int'l, Inc.*, No. 20 Civ. 3856 (PAE), Dkt. 1 (filed May 18, 2020).  On August 24, 2020, the Court accepted this case as related to *Vodden*, which has since settled.  *See id.*, Dkt. 15.  On August 25, 2020, the Court scheduled an initial pretrial conference for September 29, 2020.  Dkt. 16.

On September 23, 2020, WW moved to dismiss the SAC.  Dkts. 28–31.  The next day, the Court issued an order directing Quintanilla either to oppose that motion or amend her complaint, and stating that "[n]o further opportunities to amend will ordinarily be granted." Dkt. 32.  On September 29, 2020, the Court held the initial conference.  Dkt. 34.  On October 14, 2020, Quintanilla filed the TAC, which is now the operative pleading in this case. *See* TAC.

On November 4, 2020, WW moved to dismiss the TAC, Dkt. 37, and in support filed a memorandum of law, *see* WW Mem.; the declaration of Kristin D. Lockhart, Esq., Dkt. 39 ("Lockhart Decl."); and the declaration of Maureen Martin, *see* Martin Decl., with supporting exhibits.  On November 18, 2020, Quintanilla opposed that motion.  Dkt. 41 ("Pl. Mem.").  On November 25, 2020, WW replied, Dkt. 42 ("WW Reply"), and filed another declaration from Ms. Lockhart, Dkt. 43 ("Second Lockhart Decl."), with a supporting exhibit.

## II.    Legal Standard

### A.    Motion to Dismiss Under Rule 12(b)(1) for Lack of Standing

"A claim that a party lacks standing to bring suit is an attack on a court's subject matter jurisdiction over that party."  *EMI Entm't World, Inc. v. Karen Recs., Inc.*, No. 05 Civ. 390 (LAP), 2013 WL 2480212, at *2 (S.D.N.Y. June 10, 2013) (citing *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541–42 (1986)).  Constitutional standing thus "is the threshold question in every federal case, determining the power of the court to entertain the suit."  *Warth v. Seldin*,

422 U.S. 490, 498 (1975).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Makarova*, 201 F.3d at 113.  In analyzing whether subject-matter jurisdiction exists, a district court may consider evidence outside the pleadings, such as affidavits and exhibits.  *See id.*

### B.  Motion to Dismiss Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.  When resolving a motion to dismiss, the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff."  *Koch*, 699 F.3d at 145.  That tenet, however, does not apply to legal conclusions.  *See Iqbal*, 556 U.S. at 678.  Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

## III.  Discussion

WW first argues that the Court must dismiss Quintanilla's claims under Federal Rule of Civil Procedure 12(b)(1) because she has not alleged an injury sufficient to confer Article III standing.  Alternatively, WW argues, even if Quintanilla has standing to pursue her claims, her TAC fails to state a claim.  Quintanilla opposes WW's motion in full.  For the following reasons, the Court holds that Quintanilla has standing to pursue her individual claims for damages—not injunctive relief—but that the TAC fails to plausibly support any of those claims.  Accordingly, the Court grants WW's motion.

6

## A.      Standing

Article III standing consists of three "irreducible" elements: (1) injury-in-fact, (2) a causal connection between the injury and the conduct complained of, meaning that "the injury has to be fairly traceable to the challenged action of the defendant"; and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).  To show an injury in fact, a plaintiff must allege an injury that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560).  A plaintiff must show "standing for each claim and form of relief sought."  *Baur v. Veneman*, 352 F.3d 625, 641 n.15 (2d Cir. 2003).

As to Quintanilla's claim for damages, the Court easily concludes that she has standing. The TAC alleges that WW advertised that it would provide certain in-person services that it failed to provide.  *See* TAC ¶¶ 10(b) (WW advertised that the Workshop + Digital Membership provides access to "in-person coaching and community-based learning through . . . weekly Workshops"), 11 (WW "touts that it holds more than 40,000 in-person Workshop meetings each week"), 13–14 (WW closed all workshops amid the COVID-19 pandemic), 18.  She also alleges that, had she known that such in-person services would become unavailable, she either would not have purchased WW's services in the first place or would not have paid as much as she did for them.  *See id.* ¶¶ 12 (Quintanilla signed up for the Workshop + Digital Membership in part "because she wanted to participate in the weekly in-person support meetings"), 20 (Quintanilla relied on WW's statements about in-person services), 21 ("Had Plaintiff and Class Members known Defendants would charge the full monthly Workshop Membership prices for even when Plaintiff and Class Members did not have access to any Workshops, they either would not have signed up for the in-person Workshop Memberships or paid much less for those memberships.").  That establishes an Article III injury.  "[W]hen, as here, 'Plaintiffs contend that class members

paid more for [a service] than they otherwise would have paid, or bought it when they otherwise would not have done so,' they have suffered an Article III injury in fact." *Morrow v. Ann Inc.*, No. 16 Civ. 3340 (JPO), 2017 WL 363001, at *3 (S.D.N.Y. Jan. 24, 2017) (quoting *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 n.3 (9th Cir. 2014)); *see, e.g.*, *In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Pracs. Litig.*, 701 F. Supp. 2d 356, 377 (E.D.N.Y. 2010) ("[C]ourts have long held that a plaintiff is injured, suffering an ascertainable loss, when he receives less than what he was promised.").

WW argues that these allegations cannot support constitutional standing because WW did not, in fact, promise in-person workshops, and because its virtual workshops are in all respects equivalent to in-person meetings. *See* WW Mem. at 9–10. It also argues that Quintanilla's allegation that WW effectively "downgraded" her Workshop + Digital Membership to a Digital Membership is fallacious because the Digital Membership does not entitle subscribers to any weekly meetings, online or in-person. *Id.* at 10; Martin Decl. ¶ 11. In sum, it contends that because Quintanilla "continued to have access to group meetings with other WW members led by a WW coach," the "services [Quintanilla] received during the pandemic were identical to" those she had been promised. WW Reply at 4. But even crediting that WW continued to offer online meetings, and that such provision distinguished Quintanilla's membership from a mere Digital Membership, whether WW misrepresented its offerings to Quintanilla, and the relative value of in-person vs. virtual meetings, present quintessential merits questions. They go to whether Quintanilla has adequately pled her causes of action, including whether WW made any misrepresentation, whether any such misrepresentation was material, and whether Quintanilla's reliance on WW's representations was reasonable. Quintanilla "allege[s] that [she] would not have bought the [service] absent [WW's] advertising, which caused [her] to spend money they

would otherwise not have spent." *Morrow*, 2017 WL 363001, at *3.  That injury "is concrete, and while it may ultimately prove insufficient to justify relief under the statutes at issue, it is sufficient to confer constitutional standing." *Id.*  Holding otherwise would convert the mine run of routine challenges under Rule 12(b)(6)—*e.g.*, whether a plaintiff had plausibly alleged the materiality of a misrepresentation, or damages—into attacks on the Article III authority of the reviewing court.  The Court thus denies WW's motion to dismiss Quintanilla's claim for retrospective damages for lack of constitutional standing.

As to the injunctive relief Quintanilla seeks, the analysis differs.  Past purchasers of deceptively marketed products or services are ill-suited, under Article III, to seek injunctive relief.  *See Berni v. Barilla S.p.A.*, 964 F.3d 141, 147–49 (2d Cir. 2020) (vacating class certification providing for injunctive relief because class lacked standing to pursue such relief).  As to such remedies, "[t]he prospective-orientation of the analysis is critical: to maintain an action for injunctive relief, a plaintiff 'cannot rely on past injury . . . but must show a likelihood that he . . . will be injured in the future.'"  *Id.* at 147 (quoting *Deshawn E. ex rel. Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)).  Such an injury must be "actual and imminent, not conjectural or hypothetical."  *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  And, as the Circuit explained, purchasers who claim to have been deceived by a defendant's deceptive or misleading practices, even if they intend to purchase the good or service at issue again in the future, "will not again be under the illusion" that caused their initial harm: "instead, next time they buy [the product], they will be doing so with exactly the level of information that they claim they were owed from the beginning."  *Id.* at 148.  In such circumstances, plaintiffs lack standing to seek injunctive relief because "[t]he requisite imminent threat of future injury [is not] present," even "based on a representation by plaintiff of intent to purchase" the same

9

deceptively marketed product "in the coming months."  *Id.* (quoting 1 McLaughlin on Class

Actions § 5:15 (15th ed. 2018)).  Thus, courts have held, following *Berni*, that past purchasers

generally lack standing to seek an injunction because it is unlikely that they, or any class they

seek to represent, will suffer the same harm again.  *See, e.g.*, *Campbell v. Whole Foods Mkt.*

*Grp.*, No. 20 Civ. 1291 (GHW), 2021 WL 355405, at *16 & n.17 (S.D.N.Y. Feb. 2, 2021)

(collecting cases).[3]

Given the allegations in the TAC, these principles preclude Quintanilla's standing to seek

injunctive relief, on her own behalf or on behalf of a class.  Quintanilla alleges that she signed up

for WW's Workshop + Digital Membership with the expectation that WW would keep offering

in-person services at the price she opted to pay, but that she was injured when she was "forced to

pay the full Workshop Membership prices" after WW canceled in-person meetings during the

COVID-19 pandemic.  TAC ¶ 21.  She claims that, had she "known [WW] would charge the full

monthly Workshop Membership prices . . . even when [she] did not have access to any

---

[3] *Berni* itself addressed only whether an entire certified class of past purchasers could show the requisite likely future harm to support common treatment under Federal Rule of Civil Procedure 23, not whether any given purchaser could ever show such likelihood.  *See Berni*, 964 F.3d at 149 ("Since injunctive relief is not proper for the group of past purchasers of Barilla pasta—because not every member of that group stands to benefit from the [revised representations] included in the settlement proposal—that group cannot be certified as a Rule 23(b)(2) class.").  But since *Berni* issued, courts in this Circuit, including this one, "have uniformly applied *Berni* in the context of motions to dismiss" directed at the named plaintiff's individual claims.  *Campbell*, 2021 WL 355405, at *16 n.17; *see Patellos v. Hello Prods., LLC*, No. 19 Civ. 9577 (PAE), 2021 WL 827769, at *10–11 (S.D.N.Y. Mar. 4, 2021); *Rivera v. Navient Sols., LLC*, No. 20 Civ. 1284 (LJL), 2020 WL 4895698, at *14 (S.D.N.Y. Aug. 19, 2020) (dismissing plaintiff's claim for lack of standing under *Berni* because "[e]ven if he became a debtor again on a student loan serviced by Navient, there is no reason to believe he will be under the same illusion again").  Thus, although *Berni* did not categorically hold that individual past purchasers can never have standing to pursue injunctive relief on her own behalf, rather than on behalf of a class, its reasoning supports that such a showing is a difficult one to make.  As discussed below, on the facts pled, Quintanilla here fails to do so.

Workshops, [she] either would not have signed up for the in-person Workshop Memberships or paid much less for those memberships." *Id.* Now, however, Quintanilla, by her own admission, is aware that WW's alleged in-person representations were not reliable, at least in the face of a global pandemic, and that WW, allegedly, was not apt to spontaneously issue refunds or lower its prices in the face of such a development. *See, e.g.*, *id.* ¶ 22; Pl. Mem. at 6–7.[4] Because she has now "*necessarily* become aware of the alleged misrepresentations, 'there is no danger that [Quintanilla] will again be deceived by them,'" and that she will be harmed again in the same way. *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 465–66 (S.D.N.Y. 2020) (citation omitted). Thus, Quintanilla lacks standing to pursue injunctive relief on her own behalf or on behalf of the class.

Quintanilla's arguments to the contrary are unpersuasive. First, she cites California cases assessing standing under the UCL and CLRA—many of which do not specifically concern standing to seek injunctive relief. *See* Pl. Mem. at 9–10 (collecting cases). But "the Court begins not with out-of-circuit caselaw, but with binding Supreme Court and Second Circuit precedent." *Hesse*, 463 F. Supp. 3d at 465 (holding that plaintiffs lacked standing to pursue injunctive relief in false-advertising case). Quintanilla does not mention *Berni*, let alone distinguish how her claims might survive its analysis.

Second, she argues that the fact that she has continued to subscribe to WW—and has therefore continued to suffer injuries—establishes a likelihood of imminent future injury. *See* Pl. Mem. at 10. Plaintiffs, however, "cannot manufacture standing merely by inflicting harm on themselves." *Steven v. Carlos Lopez & Assocs., LLC*, 422 F. Supp. 3d 801, 807 (S.D.N.Y. 2019)

---

[4] As discussed below, however, Quintanilla alleges that WW gave her two months' worth of free access to remote workshops while its in-person workshops were closed during the pandemic. *See* TAC ¶ 16.

(quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013)), *aff'd sub nom. McMorris v. Carlos Lopez & Assocs., LLC*, No. 19-4310, 2021 WL 1603808 (2d Cir. Apr. 26, 2021); *see Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) ("No [party] can be heard to complain about damage inflicted by its own hand.").  In any event, given Quintanilla's choice to continue subscribing to WW, she cannot viably claim that she stands to be injured *in the same way* as she claims to have been by WW's purportedly false promises of in-person workshops.  Even if she continues to subscribe to WW, "there is no reason to believe that [she] will incur a harm anew." *Berni*, 964 F.3d at 148.  That is because, once deceived by WW's conduct, she "will not again be under the illusion" that WW would maintain in-person workshops, else *sua sponte* reduce prices or issue refunds, during this, or a future, pandemic.  *Id.*  Instead, in continuing to subscribe to WW since the pandemic began, despite WW's lack of in-person services, she has acted "with exactly the level of information that [she] claim[s] [she was] owed from the beginning." *Id.* Thus, Quintanilla has not established a future injury, arising from WW's conduct, that is "actual and imminent," "real and immediate," "certainly impending," and "likely." *Hesse*, 464 F. Supp. 3d at 465–66 (collecting cases).

Last, Quintanilla raises policy concerns with the implications of the holding in *Berni*. Pl. Mem. at 11 (collecting California cases).  But the Circuit expressly considered those concerns, yet "went on to reject the policy-based rationale that underpins most of the cases on which Plaintiff relies." *Campbell*, 2021 WL 355405, at *15 n.16; *see Berni*, 964 F.3d at 148 (rejecting notion that policy concerns about a "Catch-22" for consumer plaintiffs seeking injunctive relief permit courts to "create[e] an exception to the" ordinary rules of standing and class certification).  The Court rejects Quintanilla's second-guessing of the Circuit's assessment of the implications of its holding.

Thus, Quintanilla lacks standing to pursue injunctive relief, on her own behalf or on behalf of a class.  The Court dismisses her claims for injunctive relief under Rule 12(b)(1).[5]

### B.    California Consumer-Protection Claims

#### 1.    CLRA, UCL, and FAL

Quintanilla brings claims under three California consumer-protection statutes: the CLRA, the UCL, and the FAL.  *See* TAC ¶¶ 34–67.

The CLRA proscribes specified "unfair methods of competition and unfair or deceptive acts or practices," including: "representing that goods or services have characteristics, uses, or benefits that they do not have"; "representing that goods or services are of a particular standard, quality, or grade, if they are of another"; "advertising goods or services with intent not to sell them as advertised"; and "representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not."  TAC ¶ 38 (quoting Cal. Civ. Code § 1770(a)(5), (7), (9), (16)) (cleaned up).[6]

---

[5] Because Quintanilla lacks Article III standing to pursue her own claims for injunctive relief, she also may not pursue those claims on behalf of a class.  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) ("A plaintiff seeking to represent a class must personally have standing.").  As for Quintanilla's claims for damages, the Court does not have occasion to resolve whether she has "class standing" to pursue such claims because the Court dismisses those for failure to state a claim.  *See, e.g.*, *Petrosino v. Stearn's Prods., Inc.*, No. 16 Civ. 7735 (NSR), 2018 WL 1614349, at *5 (S.D.N.Y. Mar. 30, 2018) (collecting cases "defer[ring] consideration of the class standing question to the class certification stage"); *Moses v. Apple Hosp. REIT Inc.*, No. 14 Civ. 3131 (DLI) (SMG), 2016 WL 8711089, at *4 (E.D.N.Y. Sept. 30, 2016) ("Since Plaintiff has Article III standing, the more prudent approach is to analyze class standing at the class certification stage because the Plaintiff has already established a case or controversy between the parties."); *Segovia v. Vitamin Shoppe, Inc.*, No. 14 Civ. 7061 (NSR), 2016 WL 8650462, at *3 (S.D.N.Y. Feb. 5, 2016) ("Once Plaintiffs have satisfied their Article III standing requirements, *NECA-IBEW* thus instructs that . . . their ability to represent putative class members who purchased products plaintiffs have not themselves purchased is a question for a class certification motion." (citation omitted)).

[6] In the TAC, Quintanilla disclaims seeking any relief under the CLRA other than injunctive relief.  TAC ¶ 41 (Quintanilla "by this Complaint bring[s] only an action for injunctive relief

The UCL prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. "The UCL '"borrows" violations from other laws by making them independently actionable as unfair competitive practices." *Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 682 (S.D.N.Y. 2017) (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 943 (Cal. 2003)), *aff'd sub nom. Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699 (2d Cir. 2019). "For example, 'any violation of the [FAL] necessarily violates the UCL.'" *Id.* (quoting *Kasky v. Nike, Inc.*, 45 P.3d 243, 250 (Cal. 2002)).

Finally, the FAL, as relevant here, makes it unlawful for any person or entity make any public advertisement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading," or to make any such statement "as part of a plan or scheme with the intent not to sell" the advertised property or services "as so advertised." Cal. Bus. & Prof Code § 17500. It therefore prohibits any "unfair, deceptive, untrue, or misleading advertising." *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).

"Courts often analyze these statutes together because they share similar attributes." *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942, 985 (S.D. Cal. 2014) (collecting cases). Two such attributes are relevant here. First, all three laws require plaintiffs to meet the pleading standards of Federal Rule of Civil Procedure 9(b). *See, e.g.*, *Great Pac. Sec. v. Barclays Cap., Inc.*, 743 F. App'x 780, 783 (9th Cir. 2018) (FAL claims

---

under the CLRA pursuant to § 1782(d) of the Act."). The Court has held that Quintanilla lacks standing to pursue such relief. Thus, she lacks standing to pursue the relief sought in the TAC under the CLRA. The Court's reasoning below as to the UCL and FLA, however, applies equally to the CLRA such that, had the Court jurisdiction to address that claim, it similarly would have required dismissal.

are subject to Rule 9(b)); *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009)

("[W]e have specifically ruled that Rule 9(b)'s heightened pleading standards apply to claims

for violations of the CLRA and UCL.").  Second, all three are "governed by the 'reasonable

consumer' test."  *Williams*, 552 F.3d at 938; *see Freeman v. Time, Inc.*, 68 F.3d 285, 289

(9th Cir. 1995) ("[T]he false or misleading advertising and unfair business practices claim must

be evaluated from the vantage of a reasonable consumer." (citation omitted)); *see also Utts*,

251 F. Supp. 3d at 682–83.  Under that standard, a plaintiff must "show that 'members of the

public are likely to be deceived'" by any alleged misrepresentations.  *Williams*, 552 F.3d at 938

(quoting *Freeman*, 68 F.3d at 289).

   Quintanilla's theory of liability under each statute is essentially the same: WW violated

each by falsely representing that its monthly membership programs included in-person meetings,

whereas in fact, WW canceled such in-person services during the COVID-19 pandemic and did

not issue unilateral refunds or reduce the costs of its membership services.  *See* TAC ¶¶ 37

(WW's "retention of [Quintanilla's] monthly membership fees without providing all promised

benefits of the membership, including full in-person access to services at Workshop locations, is

an unfair business practice in violation of CLRA"), 39 (WW "violated the CLRA by representing

and failing to disclose material facts regarding its monthly membership program, as described

above, when they knew, or should have known, that the representations were false and

misleading"), 50 (WW's "retention of the monthly fees without providing the full services

promised" violates the UCL), 55 (WW misled "consumers into believing they will have full

access to all of the program benefits by paying the monthly fee," in violation of the UCL), 64

(WW violated the FAL because its "advertising that the WEIGHT WATCHERS programs are

accessible, and that its customers would have access to its various Workshop locations and

15

services upon paying a monthly membership fee is false and misleading to reasonable consumers, including Plaintiff, because Defendants in fact closed its Workshop locations while continuing to charge customers for full access.").

WW argues that these claims must be dismissed for two reasons. First, it contends that Quintanilla has failed to plausibly allege that any reasonable consumer would have taken any statements by WW about its in-person workshops to mean that WW would never, even faced with a once-in-a-century pandemic, modify the in-person aspect of those workshops. *See* WW Mem. at 16–18. That is especially so, WW argues, because the T&C—to which Quintanilla undisputedly consented when she became a WW subscriber, *see, e.g.*, TAC ¶ 5—put all WW subscribers on notice that WW retains discretion to "discontinue or modify any aspect of the Offerings," T&C ¶ 3 ("Your Membership"). Second, WW argues that Quintanilla has failed to plead these claims with the particularity required by Rule 9(b) because the TAC fails to identify where or when WW allegedly represented that it would provide in-person services. WW Mem. at 18–19; *see Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (To plead a claim with particularity as required by Rule 9(b), a plaintiff must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." (citation omitted)). In support, WW notes that one of the quotations cited in the TAC misquotes WW's website to insert the words "in-person," and that none of the other allegations about in-person representations provide detail about when or where they were made. WW Mem. at 3 n.1, 18; WW Reply at 2–3, 7.

The Court holds with WW. Beginning in March 2020, a deadly, novel, and unforeseen pandemic forced businesses, schools, and institutions of all kinds, across the globe,

to close their doors to protect the public.  As relevant here, California's governor, on March 19,

2020, signed an executive order which ordered "all individuals living in the State of California to

stay at home" with limited exceptions.  *See* Cal. Exec. Order No. N-33-20 (Mar. 19, 2020).  Soon

after, municipalities across the state (and, of course, country) issued orders requiring the closure

of certain non-essential businesses.  *See, e.g.*, *Brandy v. Villanueva*, No. 20 Civ. 2874 (AB),

2020 WL 3628709, at *1 (C.D. Cal. Apr. 6, 2020) (discussing Los Angeles closure laws);

*Tralom, Inc. v. Beazley USA Servs., Inc.*, No. 20 Civ. 8344 (JFW), 2020 WL 8620224, at *2

(C.D. Cal. Dec. 29, 2020) (discussing similar orders in Ventura County, where Quintanilla

resides).  Even assuming that Quintanilla has pled her claims—*i.e.*, that WW, at times, marketed

its membership services as including in-person aspects—with particularity under Rule 9(b),[7] no

reasonable consumer could have understood such representations to mean that WW promised to

keep offering such services even in the face of a deadly pandemic, and in defiance of dictates of

the civil authorities.  Of course, WW likely expected to offer such services when it advertised

them; and by all indications, Quintanilla expected to use them.  *See, e.g.*, TAC ¶ 12.  Indeed, its

representations to this effect were undisputedly true until March 2020.  *Id.* ¶ 13.  But nowhere

---

[7] And that assumption is dubious.  The TAC identifies two statements ostensibly to this effect:
One, "[o]n [WW's] website," allegedly "tout[ed] that [WW] holds more than 40,000 in-person
Workshop meetings each week."  TAC ¶ 11.  But the URL that WW cites for that proposition
does not include the phrase "in-person."  *See About Us*, WW, https://www.weightwatchers.com
/about/crp/index.aspx ("Weight Watchers holds more than 40,000 meetings each week[.]").
Quintanilla's misquotation of that language, and continued insistence that it supports her
position, is regrettable.  *See* Pl. Mem. at 14.  The second misrepresentation alleged—that WW
offers access to "in-person coaching and community-based learning through [its] weekly
Workshops"—is not presented with any context as to when or where it was made.  That said,
WW's website—which, as WW notes, is incorporated by reference into Quintanilla's
complaint—does, today, contain such language.  *See My WW*, WW (2021), https://www
.weightwatchers.com/us/hcp/plans/meetings ("WW offers in-person coaching and community-based
learning through our weekly Workshops at WW Studios.").  Thus, although the TAC's pleading
leaves much to be desired, the Court will not base its dismissal of Quintanilla's claims on a
failure to conform to Rule 9(b).

does Quintanilla allege that WW represented it would continue to offer uninterrupted access to in-person meetings, regardless of the circumstances and without taking heed of the fast-emerging public-health emergency presented by the COVID-19 pandemic.

In this respect, recent decisions addressing consumer-protection claims in the educational context—although under other states' laws—present a helpful analogy.  Across the board, courts in recent months have dismissed claims under such laws even where colleges and universities had advertised in-person educational opportunities.  *See, e.g.*, *Crawford v. Presidents & Dirs. of Georgetown Coll.*, No. 20 Civ. 1141 (CRC), 2021 WL 1840410, at *14 (D.D.C. May 7, 2021) (dismissing claims for tuition refund under the D.C. Consumer Protection Act because "[a] reasonable student would have understood that, even if American *expected* to offer campus-based programs and facilities throughout the semester, the university had not bound itself to an obligation to do so in all circumstances"); *Espejo v. Cornell Univ.*, No. 20 Civ. 467 (MAD), 2021 WL 810159, at *9 (N.D.N.Y. Mar. 3, 2021) (same under New York General Business Law ("GBL") §§ 349 and 350 because "[p]laintiffs have not plausibly alleged that Cornell's marketing materials would lead a reasonable consumer to believe that it would continue to offer in-person learning and an on-campus experience even in the face of a deadly pandemic"); *Goldberg v. Pace Univ.*, No. 20 Civ. 3665 (PAE), 2021 WL 1565352, at *13 (S.D.N.Y. Apr. 21, 2021) ("[E]ven drawing all reasonable inferences in [plaintiff's] favor, there is nothing about the facts pled as to Pace's response to the public-health crisis and executive orders prohibiting on-campus instruction, *i.e.*, the transition to remote learning, that makes them deceptive or misleading within the meaning of N.Y. GBL § 349."); *Botts v. Johns Hopkins Univ.*, No. 20 Civ. 1335 (ELH), 2021 WL 1561520, at *20 (D. Md. Apr. 21, 2021) (similar under Maryland consumer-protection statute); *In re Columbia Tuition Refund Action*, No. 20 Civ. 3208 (JMF),

18

2021 WL 790638, at *10 (S.D.N.Y. Feb. 26, 2021) (same where defendants did not know "in advance that a pandemic would necessitate fundamental changes to its services and operations beginning in mid-March 2020"); *Bergeron v. Rochester Inst. of Tech.*, No. 20 Civ. 6283 (CJS), 2020 WL 7486682, at *11 (W.D.N.Y. Dec. 18, 2020) (same because "no reasonable prospective student could consider him- or herself 'deceived' or 'misled' where the school's normal course of on-campus instruction was altered mid-semester by an unforeseen global pandemic that prompted the Governor of New York to issue an unprecedented executive order prohibiting on-campus, in-person instruction"); *Ford v. Rensselaer Polytechnic Inst.*, No. 20 Civ. 470 (DNH), 2020 WL 7389155, at *10 (N.D.N.Y. Dec. 16, 2020) (same because "[n]o reasonable consumer would expect a university to remain open for in-class instruction in the face of a pandemic and a state-mandated shutdown, regardless of whether the school advertised on-campus learning as a strength."); *see also Ashton v. J.M. Smucker Co.*, No. 20 Civ. 992 (JGB), 2020 WL 8575140, at *9 (C.D. Cal. Dec. 16, 2020) (noting similarity between "reasonable consumer" standard under the GBL and California statutes). So too here. Even if, at points, WW advertised in-person elements of its membership services, the TAC fails to plausibly allege any representation that such marketing would have led a reasonable consumer to believe that WW would never, even under dire public-health circumstances, modify or discontinue those elements.[8]

---

[8] Quintanilla notes that California courts have "recognized that whether a business practice is deceptive will usually be a question of fact not appropriate for decision on" a motion to dismiss. Pl. Mem. at 11 (quoting *Williams*, 552 F.3d at 938). But "[i]t is well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer," including under the California statutes at issue. *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013) (citing *Freeman*, 68 F.3d at 289) (assessing New York and California claims together). "Indeed, a number of courts have dismissed UCL claims as a matter of law post-*Williams*[.]" *Red v. Kraft Foods, Inc.*, No. 10 Civ. 1028 (GW), 2012 WL 5504011, at *3 (C.D. Cal. Oct. 25, 2012); *see In re Sony Gaming*, 996 F. Supp. 2d at 989 ("[C]ourts have granted motions to dismiss under the UCL, FAL, and CLRA on the basis that the alleged misrepresentations were not false, misleading, or deceptive as a matter of law.").

That conclusion is bolstered by two aspects of Quintanilla's subscription.  The first, at paragraph 3 of the T&C, put Quintanilla on notice of the fact that WW retained discretion to modify, or even discontinue, aspects of its subscription services at its sole discretion.  *See* T&C ¶ 3 ("In [WW]'s sole discretion and without prior notice or liability, we may discontinue or modify any aspect of the Offerings[.]" ).  Thus, even if a reasonable consumer might have otherwise understood WW's offering of in-person services to have been immutable, the T&C would have disabused such a reasonable consumer of that notion.  *See, e.g.*, *In re Sony Gaming*, 996 F. Supp. 2d at 991 (reasonable consumer, under California law, would not have understood the defendant to have promised "continued and uninterrupted access" to services where its user agreement informed consumers that it "access to [those services] may be interrupted").  The second, at paragraphs 7 and 15 of the T&C, authorized Quintanilla to cancel her membership and seek a refund in the event of, *inter alia*, "a Workshop closure."  Yet, since the onset of the pandemic, Quintanilla has continued, monthly, to subscribe to WW's services without invoking these provisions.  That failure renders hollow any claim on her part that WW's failure to *sua sponte* issue refunds was unfair or deceptive.

Thus, the Court dismisses Quintanilla's claims under the CLRA, UCL, and FAL.

### 2.    Weight Loss Contracts Act

Quintanilla also brings claims under a separate California law, the WLCA.  *See* Cal. Civ. Code § 1694.5 *et seq*.  She posits these violations of that law: (1) WW failed to include a notice in the T&C as required by Cal. Civ. Code § 1694.7(b); (2) WW failed to give her a refund as required by Cal. Civ. Code § 1694.6(a); and (3) WW fraudulently or misleadingly advertised in-person services under Cal. Civ. Code § 1694.9(b).  *See* TAC ¶¶ 90–98.  None of these claims, however, establishes a violation of those provisions.

First, Quintanilla's allegation as to the notice required by section 1694.7(b) is refuted by the T&C. That section of the WLCA requires that every weight-loss contract include "in close proximity to the space reserved for" the buyer's signature and "in a size equal to at least 10-point boldface type," the following notice:

> You, the buyer, may cancel this agreement, without any penalty or obligation, at any time prior to midnight of the original contract seller's third business day following the date of this contract, excluding Sundays and holidays. To cancel this agreement, mail or deliver a signed and dated notice, or send a telegram which states that you, the buyer, are canceling this agreement, or words of similar effect. This notice shall be sent to: [company address].

Cal. Civ. Code § 1694.7(b); *see* TAC ¶ 94. The T&C, at paragraph 15, contains precisely that language. But Quintanilla does not address that fact, or identify any way in which the notice violates California law. *See* Pl. Mem. at 21–22.

Second, Quintanilla's charge that WW refused her refund request is similarly belied by her own allegations and the documents incorporated by reference into the TAC. The provision of the WLCA that Quintanilla cites for this allegation requires that any buyer of a weight-loss contract be permitted "to cancel a weight loss contract or offer until midnight of the third business day after the day on which the buyer signs an agreement or offer to purchase those services." Cal. Civ. Code § 1694.6(a).[9] Under that law, notice of cancellation is effective when "it indicates the intention of the buyer not to be bound by the weight loss contract." *Id.* § 1694.6(d). Quintanilla alleges that WW violated that provision because "[w]hen [she]

---

[9] Although WW does not press this point, the TAC does not, in fact, allege that Quintanilla sought a refund by "midnight of the third business day after the day on which" she bought WW's services. TAC ¶¶ 14–16 (alleging that WW closed its workshops on March 16, that Quintanilla paid her monthly fee on March 18, and that Quintanilla contacted WW in May 2020). It is thus not clear that, even had WW chosen not to honor a cancellation request for the operative month, it would have violated California law. The Court, however, does not rely on this somewhat technical point in granting WW's motion to dismiss.

requested a refund from [WW], [WW] refused." TAC ¶ 93. But elsewhere in the TAC Quintanilla provides detail that refutes that characterization. *See id.* ¶ 16. In the only paragraph of the TAC elaborating on the "refusal" mentioned above, Quintanilla notes that WW "encouraged" her to "try the electronic (virtual) program and, in turn offered to provide the next two months for free. As such, [WW] did not debit Plaintiff for the next two payment cycles." *Id.* And the text of the interaction between Quintanilla and WW's customer-service department further supports paragraph 16's characterization.[10] After Quintanilla noted that she would like to cancel her subscription, the WW representative offered her a 60-day credit "to help you get through the next few months," noting that "[i]f you decide you are no longer utilizing our service you will need to cancel to prevent continued billing." Martin Decl., Ex. 3 ("May 11 Chat") at 2. Quintanilla responded, "Okay, I will try that, I don't really want to cancel but I am not getting to use my membership and I don't want to pay for something that I am not using." *Id.* Thus, neither the TAC nor the May 11 Chat support that Quintanilla, in the end, sought to cancel her WW subscription or that WW refused such request. Quintanilla therefore has not plausibly alleged any violation of Cal. Civ. Code § 1694.6(a).

Last, Quintanilla claims that WW violated Cal. Civ. Code § 1694.9(b), which states that "[a]ny contract for weight loss services entered into under willful and fraudulent or misleading information or advertisements of the seller is void and unenforceable." For the reasons above, WW's representations about its in-person services, even assuming they were made, were neither

---

[10] In the TAC, Quintanilla refers specifically to the fact that on May 11, 2020, she "contacted [WW's] customer service department via its online chat function." The Court thus treats the text of the chat as incorporated by reference in the TAC. *See Atl. Recording Corp.*, 603 F. Supp. 2d at 694. In any event, the allegations at paragraph 16 of the TAC, even standing alone, do not support that WW "refused" a refund request in violation of California law.

fraudulent nor misleading.  *See supra* pp. 16–20.  Nor has Quintanilla plausibly alleged that any

misrepresentation in WW's advertisement of in-person services was willful, as the WLCA

requires, given that WW offered in-person services until the pandemic precluded it from doing

so.  Quintanilla's allegations about WW's willfulness are conclusory and unsupported by factual

allegations, and therefore fail to state a claim.  *See* TAC ¶ 96 ("[WW]'s actions were thus willful.

[WW] knew or should have known that [WW was] breaching its contracts with customers and

fraudulently charging fees when it continued charging full Workshop Membership fees while all

of its physical Workshop locations and all in-person Workshop services were closed, cancelled,

or non-accessible[.]").  Thus, the Court dismisses Quintanilla's claims under the WLCA.

### C.    Breach of Contract

Quintanilla also brings a claim for breach of contract, under New York common law.[11]

She alleges that WW breached the parties' contract by failing "to only charge Plaintiff and the

Class Workshop Membership fees if [WW] provided the Workshop Membership benefits to

Plaintiff and the Class" when it transitioned from in-person to remote workshop meetings.  To

state a claim for breach of contract under New York law, defendants must allege "(1) the

existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach

of contract by the defendant, and (4) damages."  *Eternity Glob. Master Fund*, 375 F.3d at 177

---

[11] Although Quintanilla, a California citizen, pursues the consumer claims above under
California law, the parties have exclusively discussed her common-law claims for breach of
contract, including the breach of the implied duty of good faith and fair dealing, unjust
enrichment, and money had and received, under New York law.  Where "[t]he parties' briefs
assume that New York substantive law governs the issues presented, . . . such implied consent is,
of course, sufficient to establish the applicable choice of law."  *Arch Ins. Co. v. Precision Stone,
Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (quoting *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514
n.4 (2d Cir. 2001)); *see Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).
Thus, the Court "follow[s] their lead" and applies New York law to Quintanilla's common-law
claims.  *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997).

(quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).  To plausibly allege a breach of contract, a plaintiff must identify "the specific provisions of the contract upon which liability is predicated."  *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 33 (S.D.N.Y. 2017) (citing *Sud v. Sud*, 211 A.D.2d 423, 424 (1st Dep't 1995)), *aff'd*, 712 F. App'x 85 (2d Cir. 2018) (summary order).

Quintanilla's breach-of-contract claim fails for the straightforward reason that her contract with WW does not mention, let alone promise, in-person workshops.  The TAC does not identify which provision of the T&C (which Quintanilla does not dispute governs her WW subscription) created such a contractual obligation.  *See* TAC ¶¶ 81–88.  Even after receiving WW's motion to dismiss, she did not identify any specific term in the T&C which even potentially obliged WW to provide in-person workshops.  Pl. Mem. at 19–20.  Instead, responding to that motion, Quintanilla cites only her own allegations of WW's "duties and obligations to Plaintiff including the duty to only charge . . . Workshop Membership fees if [WW] provided the Workshop Membership benefits."  *Id.* at 20; *see also* T&C ¶ 1 (discussing "attendance" at workshops without specifying location, as well as "one on one phone sessions, emails and/or texts").  She also notes that she "originally expected to receive" access to in-person services.  Pl. Mem. at 20.  But such extrinsic expectations do not define the terms of the parties' agreement; absent a contractual ambiguity—which Quintanilla does not allege—the parties' intent must instead "be construed from the four corners of the agreement."  *Fleming v. Fleming*, 137 A.D.3d 1206, 1207 (1st Dep't 2016) (citation omitted); *see LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 208 n.10 (2d Cir. 2005).

WW, on the other hand, identifies a clear grant of contractual discretion in the T&C, authorizing it to "discontinue or modify *any aspect* of the Offerings or the Website and/or Apps,

including, but not limited to . . . restricting the amount of use and/or access permitted, and . . . restricting or terminating anyone's right to use and/or access the Offerings, the Website and/or Apps." T&C ¶ 3 (emphasis added). The T&C also states that WW may to do so "in [its] sole discretion and without prior notice or liability," and that Quintanilla "agree[s] that [WW] shall not be liable to you or any third party for any termination or cancellation of your access to or use of the Offerings . . . , except for a refund of any prepaid fees or charges in accordance with Section 6 of this Agreement." *Id.* ¶ 3.[12]

In sum, Quintanilla does not identify any term in the parties' contract that WW breached by switching from in-person to remote workshops during the pandemic, without issuing refunds or lowering prices; and WW identifies contractual language expressly authorizing it to modify or discontinue its offerings without liability. The Court therefore dismisses Quintanilla's claim for breach of contract.

### D.     Breach of the Implied Duty of Good Faith and Fair Dealing

As part of her cause of action for breach of contract, Quintanilla also alleges that WW breached the implied covenant of good faith and fair dealing (the "implied covenant") because, even absent an express contract term requiring in-person meetings, WW's "discretion was sufficiently constrained under the terms of the contract to support an implied obligation of good faith and fair dealing." TAC ¶ 86; *see id.* ¶ 87 (alleging that defendants breached the implied covenant by closing workshops and continuing to charge full membership fees without issuing refunds). WW argues that Quintanilla's claim for breach of the implied covenant is conclusory,

---

[12] As discussed, Quintanilla's allegations that WW "refused" her refund request is refuted by both the TAC's allegations and documents it incorporates by reference.

duplicative of her breach-of-contract claim, and foreclosed by the parties' contract.  The Court agrees.

Under New York law, a duty of good faith and fair dealing is implied in every contract, to the effect that neither party "shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407 (2d Cir. 2006) (quoting *M/A–COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (per curiam)).  The implied covenant does not include any term inconsistent with the terms of the contractual relationship, or "create duties which are not fairly inferable from the express terms of that contract." *Interallianz Bank AG v. Nycal Corp.*, No. 93 Civ. 5024 (RPP), 1994 WL 177745, at *8 (S.D.N.Y. May 6, 1994) (citing *Fasolino Foods Co. v. Banco Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992)).  Nor can it "be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights." *Nasdaq, Inc. v. Exch. Traded Managers Grp.*, 431 F. Supp. 3d 176, 252 (S.D.N.Y. 2019) (quoting *Peter R. Friedman, Ltd. v. Tishman Speyer Hudson L.P.*, 107 A.D.3d 569, 570 (1st Dep't 2013)).  But it includes promises that a "reasonable person in the position of the promisee would be justified in understanding were included" in the contract and, when the contract involves the exercise of discretion, a promise "not to act arbitrarily or irrationally in exercising that discretion." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (citation omitted).  "[S]ince there is a presumption that all parties act in good faith, the burden of proving a breach of the covenant of good faith and fair dealing is on the person asserting the absence of good faith." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) (quoting 23 Williston on Contracts § 63:22 (4th ed. 2006)).

However, where a claim for breach of the implied covenant is duplicative of a claim for breach of contract, the former must be dismissed.  *See, e.g.*, *Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015).  Such "claims are duplicative when both 'arise from the same facts and seek the identical damages for each alleged breach.'"  *Id.* (quoting *Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 70 A.D.3d 423, 426 (1st Dep't 2010)); *see Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 299 (S.D.N.Y. 2012) (dismissing claim for breach of implied covenant where a breach-of-contract claim "based upon the same facts" was also pled).

Quintanilla fails to state a claim for breach of the implied covenant.  First, Quintanilla's claims of the existence of such a duty and WW's breach of it are conclusory, merely reciting the elements of the cause of action without explaining how WW's actions or obligations measure against the applicable legal standards.  For example, Quintanilla states, without explanation, that WW's "discretion was sufficiently constrained under the terms of the contract to support an implied obligation of good faith and fair dealing."  TAC ¶ 86.  She also alleges that WW breached that duty by "charging Plaintiff and the Class Workshop Membership and usage fees even after [WW] closed its physical Workshop locations and by not refunding the full amount of the charges."  *Id.* ¶ 87.  But she does not explain, in the face of the actual terms of the parties' contract, the nature of WW's duty, how WW's cancellation of in-person workshop meetings breached it, or how that cancellation, in response to the pandemic, was an arbitrary or irrational exercise of discretion granted under the contract.  *See, e.g.*, *Iqbal*, 556 U.S. at 678 (Rule 8 requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation.").  Nor does Quintanilla, in her opposition, address these flaws or attempt to clarify her allegations on this point.  In fact, she is silent on it.  *See* Pl. Mem. at 19–20.  "At the motion to dismiss stage, where

27

review is limited to the pleadings, a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim." *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08 Civ. 442 (TPG), 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014).

Second, implying a duty in the T&C that precluded WW from modifying or discontinuing in-person services without facing contractual liability would conflict with the provision, discussed above, authorizing WW to do just that. *See* T&C ¶ 3. It would thus impermissibly "nullify other express terms of a contract" and "create independent contractual rights." *See, e.g.*, *Nasdaq*, 431 F. Supp. 3d at 252 (quoting *Peter R. Friedman*, 107 A.D.3d at 570).

Last, even were the allegations in the TAC plausibly pled and consistent with the parties' express contract, they are duplicative of Quintanilla's claim for breach of contract, which rests on the same factual allegations: that WW continued charging full freight after transitioning its workshops online during the COVID-19 pandemic, but did not unilaterally issue refunds. TAC ¶¶ 81–87; *see Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."). Quintanilla also seeks precisely the same damages on her claims for breach of contract and breach of the implied duty, which appear to be the amounts WW either should have refunded her or by which it should have reduced its monthly subscription fees. *See* TAC ¶ 88. But "[a] cause of action to recover damages for breach of the implied covenant of good faith and fair dealing cannot be maintained where the alleged breach is intrinsically tied to the damages allegedly resulting from a breach of the contract." *Deer Park Enters., LLC v. Ail Sys., Inc.*, 57 A.D.3d 711, 712 (2d Dep't 2008) (citation omitted); *see Benihana of Tokyo*,

259 F. Supp. 3d at 37 (dismissing implied-covenant claim as duplicative where plaintiff sought "identical damages" as under breach-of-contract claim); *Amcan Holdings*, 70 A.D.3d at 426 (same). Again here, Quintanilla fails to respond to WW's argument. *See Romeo & Juliette*, 2014 WL 4723299, at *7. Instead, removing any doubt that her claims for breach of contract and breach of the implied covenant are, in fact, duplicative, she simply addresses both under the same heading, without distinguishing the two or arguing that they should be considered separately. *See* Pl. Mem. at 19–20. Thus, the Court also dismisses Quintanilla's claim for breach of the implied covenant.

### E.    Quasi-Contract Claims

Last, Quintanilla brings two quasi-contract claims: one for unjust enrichment and the other for money had and received. To establish unjust enrichment, a plaintiff must show that (1) "defendant was enriched"; (2) "at plaintiff's expense"; and (3) "equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd, L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) (citing *Clark v. Daby*, 300 A.D.2d 732, 732 (3d Dep't 2002)). Similarly, the elements of a claim of money had and received are that "(1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984).

Under New York law, a plaintiff may not recover under quasi-contract claims such as unjust enrichment or money had and received where an enforceable contract governs the same subject matter. *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (citing *Clark-Fitzpatrick, Inc. v. Long Island R.R.*, 70 N.Y.2d 382, 388 (1987)); *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 483

(S.D.N.Y. 2014) (unjust enrichment claim "not available where it simply duplicates, or replaces, a conventional contract or tort claim" (citation omitted)); *Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 416 (S.D.N.Y. 2013) ("A claim for money had and received is similarly precluded where there is an express contract between the parties addressing the same subject matter."); *Singer v. Xipto Inc.*, 852 F. Supp. 2d 416, 426 (S.D.N.Y. 2012) (If it is "settled that an enforceable contract exists," that contract "preclude[s] equitable remedies such as unjust enrichment.").  But where the quasi-contract claim involves subject matter "not covered by a valid, enforceable contractual obligation," that claim is not duplicative of a contract breach claim and need not be dismissed.  *Spirit Locker, Inc. v. EVO Direct, LLC*, 696 F. Supp. 2d 296, 305 (E.D.N.Y. 2010) (declining to dismiss unjust enrichment claim where subject matter was not covered by an enforceable contractual obligation).  Although such claims "may be plead in the alternative where the plaintiff challenges the validity of the contract; [they] may not be plead in the alternative alongside a claim that the defendant breached an enforceable contract."  *King's Choice Neckwear, Inc. v. Pitney Bowes, Inc.* (DLC), No. 09 Civ. 3980, 2009 WL 5033960, at *7 (S.D.N.Y. Dec. 23, 2009), *aff'd*, 396 F. App'x 736 (2d Cir. 2010) (summary order).  That is so even where, as here, plaintiff's contract claim fails on the merits.  *See, e.g.*, *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 22–23 (2005).

These principles require dismissal here.  WW argues that both of Quintanilla's quasi-contract claims are precluded by the existence of an undisputedly enforceable contract which governs the services that WW agreed to provide to Quintanilla and the proposed class: the T&C.  WW Mem. at 19–20.  Quintanilla responds that, under Rule 8, she may alternatively plead both quasi-contract claim and contract claims "[u]ntil a jury resolves the factual disputes regarding the enforceability of the contracts and the terms thereof."  Pl. Mem. at 16 (quoting *Linares v. Richards*,

No. 08 Civ. 3243 (RRM), 2011 WL 13295120, at *12 (E.D.N.Y. June 23, 2011)).  But here,

unlike in *Linares*, there is no doubt as to the existence of a valid contract that governs this

dispute.  *See, e.g.*, Pl. Mem. at 20 ("Plaintiff alleges that a contract exists between Plaintiff and

WW[.]").  In such circumstances, the availability of alternative pleading does not save a quasi-

contract claim that duplicates a claim for breach of contract.  *See, e.g.*, *King's Choice*, 2009 WL

5033960, at *7.  And Quintanilla's claims for unjust enrichment and money had and received

overlap entirely with her contract claims.  All rest on the same allegations: that WW promised to

provide in-person workshops to Workshop + Digital members, failed to do so after the COVID-

19 pandemic required workshop closures, and failed to refund subscription payments or reduce

its prices.  *See* TAC ¶¶ 77–78 (retention of fees is unjust enrichment "because [WW is] not

providing all of the Workshop Membership benefits [it] represented and promised to Plaintiff

and Class Members, including access to its Workshop locations"), 84 (WW breached contractual

"duties and obligations to Plaintiff including the duty to only charge Plaintiff and the Class

Workshop Membership fees if Defendants provided the Workshop Membership benefits to

Plaintiff and the Class"), 87 (WW breached implied covenant by "charging Plaintiff and the

Class Workshop Membership and usage fees even after Defendant closed its physical Workshop

locations and by not refunding the full amount of the charges"); Pl. Mem. at 18 (arguing that

Quintanilla has plausibly alleged money had and received because she paid WW "for in-person

workshops and services," WW did not provide such services, and WW kept Quintanilla's

"money paid for services that [WW] did not provide").  All are, in addition, similarly undermined

by the T&C's provision for WW's discretion to "discontinue or modify any aspect of the

Offerings, . . . including, but not limited to, . . . restricting or terminating anyone's right to use

and/or access the Offerings."  T&C ¶ 3.  The parties' valid, enforceable contract thus precludes

recovery in quasi-contract here. *See, e.g.*, *In re Columbia*, 2021 WL 790638, at \*9 (collecting cases dismissing duplicative quasi-contract claims "where the parties did not dispute that they shared a contractual relationship"); *Buonasera v. Honest Co.*, 208 F. Supp. 3d 555, 568 (S.D.N.Y. 2016) ("Because [plaintiff] fails to show how the unjust enrichment claim is not duplicative, it should be dismissed."); *Jeffers v. Am. Univ. of Antigua*, 125 A.D.3d 440, 443 (1st Dep't 2015) (same). Accordingly, the Court dismisses Quintanilla's claims for unjust enrichment and money had and received.

### F. Dismissal with Prejudice

The Court today dismisses Quintanilla's fourth effort at pleading claims against WW. In filing the TAC, Quintanilla had the benefit of reviewing the motion to dismiss the SAC filed by WW, which made essentially the same arguments that today have proven fatal to her claims. Dkts. 28–31. After that motion was filed, the Court gave Quintanilla the choice either to oppose it or to amend the SAC to fortify her claims, and informed her that this would likely be her final opportunity to amend. Dkt. 32. Quintanilla chose to amend, but has again failed to plead any plausible claims against WW. And although she has, perfunctorily, sought leave to amend yet again, *see* Pl. Mem. at 22 ("Should the Court grant any portion of Defendant's Motion, leave to amend is appropriate."), she has not suggested that she is aware of additional unpled facts that could salvage her claims. The Court's dismissal of Quintanilla's claims for damages today is therefore with prejudice, and without leave to amend. *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 506 (2d Cir. 2014) (upholding dismissal of amended complaint with prejudice where, "following Defendant's first motion to dismiss for failure to state a claim," plaintiff had amended its complaint once and failed to "resolve its pleading deficiencies in its First Amended Complaint").

**CONCLUSION**

For the foregoing reasons, the Court dismisses the TAC in full, with prejudice as to

Quintanilla's claim for damages and without prejudice, for lack of subject-matter jurisdiction, as

to her claims for injunctive relief.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 28

and 37 and to close this case.

SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated:  May 24, 2021
New York, New York